## THE PROPRIETORS OF THE TOWN OF SHAPLEIGH v. PILSBURY.

If lands be granted for pious uses to a person or corporation not *in esse*, the right to the possession and custody of the lands remains in the grantor, till the person or corporation intended shall come into existence.

And if, in the mean time, there be a disseisin, the grantor may maintain a writ of entry, counting generally upon his own seisin.

But he cannot resume the grant ; nor can he alienate the lands without such consent as is necessary for the alienation of other church property.

The tenant in a real action shall not be admitted to shew a title in any person other than the demandant, unless he can derive title from such person to himself by legal conveyance or operation of law.

*ENTRY sur disseisin,* wherein the demandants count upon their own seisin within thirty years, of the lots numbered *eleven* and *twelve,* in the first range, and *eleven* in the second range of lots in the town of *Shapleigh,* lying within the limits of the East parish in said town ; and a disseisin by the tenant. It was tried upon the general issue.

The demandants proved that at a meeting of the proprietors of *Shapleigh November* 22, 1773, a plan of the general tract composing the town was returned and accepted : and that at a subsequent meeting *September* 8, 1780 they passed the following votes, viz.

" At a meeting of the proprietors of the town of *Shapleigh* in " the county of *York,* held by adjournment *September* 8, 1780, " said proprietors now vote and grant, and it is hereby voted

Shapleigh *v.* Pilsbury.

" and granted that there shall be one other three hundred
" acres of land set off from said propriety for the sole use and
" benefit of the gospel Congregational ministry, for the sole
" use of the ministry, *so soon* as there shall be one ordained and
" settled properly in that part of said town which lays on the
" eastern side of said *Mousom* ponds or in the ranges 1, 2, 3, 4,
" and it is to be understood as a parsonage lot solely for the use
" and benefit of the ministry to improve the same—exclusive
" of the 300 acres heretofore granted to the ministry on the
" western side of said ponds. And it is hereby to be understood
" that the minister who shall settle in the said work of the min-
" istry in that part of said town lying to the eastward of said
" ponds, is not to be entitled to the land or improvement of any
" land granted on the western side of said ponds; nor any min-
" ister who shall settle on the western side of said ponds with-
" in the range lines of ten, nine, seven or six, shall be entitled
" to the improvement of any part of the parsonage lot so call-
" ed on the eastern side of said ponds."

" *Voted* also, that there be given and granted and it is hereby
" given and granted unto the first gospel minister (Congrega-
" tional plan) who shall settle in the work of the ministry in the
" western part of said township, or to the westward of *Mousom*
" ponds : That is to say one hundred acres of land in fee sim-
" ple to him his heirs and assigns forever : As also granted to
" the first gospel Congregational minister who shall legally set-
" tle in the work of the gospel ministry on the eastern side of
" *Mousom* ponds, one hundred acres of land in fee simple to him
" his heirs and assigns forever."

At a meeting of the proprietors *December* 28, 1784, a plan of
a division of the tract on the east side of the pond, (now the
east parish,) into lots, was returned and accepted; on which
plan the lot numbered *eleven* in the *first* range, containing 100
acres, and the lot numbered *eleven* in the *second* range, contain-
ing 200 acres were each marked "parsonage"; and the lot
numbered *twelve* in the *first* range, containing 100 acres was
marked as "ministerial land".

The legislature of *Massachusetts* passed an act *October* 30,
1782 confirming certain lands to claimants under *Nicholas Shap-
leigh*, including the town of *Shapleigh*, upon condition that four

hundred pounds be paid to the State, and that the several lots already appropriated to public uses, be truly reserved for those purposes. They also passed an Act *February* 24, 1795, dividing the territory of the town of *Shapleigh* into two parishes.

It appeared that the lots demanded were run out by a surveyor in *May* 1818, before the commencement of this action, by the direction of *Ichabod Lord*, who was afterwards appointed agent of the proprietors to prosecute and defend any suits which might be instituted for or against them. At the time of this survey no person was in the visible possession of either of them, though a very small part of one of them was within a fence. There had formerly been improvements on some part of the land, but the tenant's possession was only of four or five years standing.

A verdict was returned for the demandants by consent of the parties, subject to the opinion of the Court upon the general question, whether the action, upon these facts, is by law maintainable ?

This question was argued at the last *April* term in this county, and was thence continued to the present term for advisement.

*J. Holmes, for the demandants.* The plea of *nul disseisin* admits the tenant to be in possession of the lands demanded ; and the principal question therefore is whether the demandants were lawfully seized at the time of the entry by the tenant ?

As early as the year 1773 the premises had been surveyed, a plan made, returned to the proprietors, and accepted by their vote :—and these acts sufficiently shew the title to be in them, unless the tenant can shew a better. This possession was recognized by the Commonwealth of *Massachusetts* by their statute in 1782, which operates to release the right of the Commonwealth, and to confirm the title of the demandants, upon the *subsequent* condition of the payment of certain money, and the making of sundry grants to public uses. The conditions of a *confirmation* are necessarily *subsequent* in their nature. But the confirmation of the statute of 1782 has also a prospective reference in its very terms, and in the times therein mentioned for performance of the duties it imposes. The title then is good in the demandants, until condition broken.

If the condition were broken, no person could take advantage of it, but the grantor or his representative. *Rice v. Osgood*, 9 *Mass.* 38. *Newhall v. Wheeler*, 7 *Mass.* 199. But the tenant is neither of these, and is therefore a trespasser. The party entering for condition broken is in of his former estate. But the tenant had no former estate, and in this view also his entry cannot avail him, even upon the principles which he himself assumes. And if he had no title, it is not competent for him to call in question the prior possession of the demandants, nor to inquire whether a stranger has title or not. No cases have gone so far as to permit this to a trespasser. The tenant may show that the title has passed out of the demandant, where one sells land *not in his possession*, and the grantee sues in the name of his grantor ;—because this is the sale of a quarrel, and is against the policy of the law.

But it is not so in the present case. Here no person was in possession ; and before any person is *in esse* to take the reserved lands, there is an intrusion into them. There can be no remedy, unless this action is maintained.

The grant or reservation has never yet taken effect. Until a person is *in esse* capable to take, no estate passes out of the proprietors, and of course there is no breach of the condition. And if such person were now to appear, he could bring no action in his own name, a stranger being in possession.

The statute of mortmain designates no person capable to take these lands, it being confined to church wardens, vestry, and ministers, neither of which have here existed. Neither can the town claim them. It was never contemplated that they should pass to the town, as such. The reservation is to a certain part of a town,—expected to exist at some uncertain future period, which has never arrived. The minister of the *town* was expressly excluded. The condition is, that if an east parish be created—and settle a minister—and he be a congregationalist—then, and not till then, does the grant take effect.

But if a person were *in esse* capable to take, yet the grant could not operate till the grantee were in possession. *Rogers v. Goodwin*, 2 *Mass.* 475. *Adams v. Frothingham*, 3 *Mass.* 352. *Codman v. Winslow*, 10 *Mass.* 146. *Springfield v. Miller*, 12 *Mass.* 415. A grant to this purpose would be void, if a stranger

were in possession when the grant is to take effect. Nothing could pass by the deed. The estate would therefore remain in the grantor. *Co. Lit.* 6. *a. Smith v. Trinder, Cro. Car.* 22. *Welch v. Foster,* 12 *Mass.* 93.

But if the reservation be not void for these causes, yet it is void for the extreme remoteness of the contingency on which it depends. It is not enough to say that it *may* take effect—it *must* take effect in a life or lives in being, and twenty-one years afterwards. See note to *Purefoy v. Rogers,* 2 *Saund.* 382. *n. Carth.* 262. 263. Here the grant is on contingency upon contingency ;—1. that the town be incorporated—2. that it be divided into *two* parishes—3. that one of these settle a minister—4. that he be a congregational minister ;—all which not only might not happen in the time necessary, but which never have happened, and probably never will take place ;—the east parish having but about twenty congregationalists, and nearly two thousand inhabitants.

Is the fee then in *abeyance?* The books are every where clear and explicit that there can be no abeyance created by act of the parties. It arises only by the act of God :—as if there be a conveyance to *A.* remainder to the right heirs of *J. S.* and *J. S.* dies before *A.* the remainder is in abeyance. The doctrine of abeyance is odious, even in *England,*—much more here. *Commonwealth v. Martin,* 1 *Mass.* 347. Here we hold of the State, as lord paramount,—and it is of the highest necessity that there be persons to pay the taxes, and perform the public services which the State has a right to demand. No man is permitted to *throw away* his real estate.

No case can be found which admits an abeyance of the *freehold,* though there may be of the *inheritance.* 2 *Saund.* 382. *note. Co. Lit.* 216. *note* 119.

There can be no abeyance where the estate cannot vest within a life or lives in being and twenty-one years afterwards;—neither can it be created to take effect *instanter,* by act of the parties. *Bond v. West,* 2 *Wils.* 164. I am aware that a different doctrine is apparently advanced in *Pawlet v. Clark,* 9 *Cranch* 292 ; but what is there said by the learned Judge as to abeyance by act of the party, is said *ex arguendo,* but is not the point presented for the decision of the Court.

Neither can there be an abeyance of the inheritance, use, and possession, at the same time. The grant of an use, from its nature, can never be in abeyance. Until the grantee comes and demands the land, the estate is in the grantor. The analogy sometimes stated between parsonage estates in this country and in *England,* though striking, is not altogether strict. Here, the right of presentation is in the parish, the right of institution and induction in the council. Until these concur, the parson is not seized. There, the patron has no right to the glebe ;—here, the parish is seized of it. There, if no presentation is made within six months, there is a lapse ;—not so here ; and therefore here is no reason nor necessity to resort to the doctrine of abeyance. The estate goes from the sole corporation—the parson—to the aggregate corporation—the parish ; being, if the expression be allowed, an *alternate fee.* In these cases we have adopted the term *abeyance* from the *English* books, without sufficient consideration. We admit the right of possession and pernancy of profits to be in the parish, when there is a vacancy in the office of minister, but still say that the fee is in abeyance. This cannot be strictly correct ; for the right to enter and use the profits is inconsistent with abeyance. 1 *Ventr.* 374. 1 *Bl. Com.* 107. note 2. 3. *Portland ed. Fearne on Rem.* 4th ed. 513. 526. *Templeton v. Steptoe,* 4 *Munf.* 339. *Weston v. Hunt,* 2 *Mass.* 500. *Brunswick v. Dunning,* 7 *Mass.* 445.

But if the estate *may* pass out of the grantors, by the operation of the grant and confirmation, against the principles advanced, yet it still remains in the grantors until a person be *in esse* capable to take. The conveyances, at most, amount to a covenant on the part of the grantors, to stand seized to uses, deriving its force from the statute of Uses 27 *Hen.* 8. A feoffment to the uses of his *will* is a covenant to stand seized, and the estate is in the feoffor during his life. *Co. Lit.* 112. *a.* So a feoffment without livery is a covenant to stand seized. 2 *Lev.* 213. 225. And the covenantor continues in possession until the lawful use arises, 1 *Mod.* 159. 160. or the contingency happen. 2 *Saund.* 382. *note.* And the contingent uses not having arisen, the profits of the estate are decreed to the heirs of the devisor. *Hopkins v. Hopkins,* 1 *Atk.* 581. *Co. Lit.* 89. *a. note* 231. A conveyance *habendum* after the death of the grantor, is a cov-

enant to stand seized during his life. *Wallis v. Wallis*, 4 *Mass.* 135. So a deed of quitclaim, the releasee not being in possession. *Pray v. Pierce*, 7 *Mass.* 381. The statute of uses is in force here as part of our common law, so far as it is not modified by our statutes,—being brought to this country by our ancestors; is notwithstanding some expressions to the contrary in *Welch v. Foster*, 12 *Mass.* 93. The law on this subject is clearly stated in *Marshall v. Fisk*, 6 *Mass.* 24. by the late Chief Justice *Parsons*, who knew, better than any man living, what *English* statutes were in use here at the adoption of the constitution of *Massachusetts.* See also *New parish in Exeter v. Odiorne, New-Hamp. Rep.* 232.

If it be objected that a covenant to stand seized to uses is not good but upon consideration of blood or marriage; it will be replied that a valuable consideration has also been admitted as equally good, by our own tribunals. 4 *Mass.* 135. 7 *Mass.* 381. And here is a valuable consideration implied on the face of the transactions, it being evidently for the benefit of the grantors that a minister should be settled on the land. It is part of the purchase-money. The Commonwealth has paid the consideration in the grant of the residue of the land. But if there be no consideration, the reservation is void, and no use can arise.

This is the nature of a grant to the use of the ministry; or of a private fund reserved for the use of a minister;—a mere eleemosynary donation, to a private institution. In such case there must be a visitatorial power somewhere;—and this not being declared in the grant, it remains in the grantor. 1 *Ld. Raym.* 5. If a fund be consecrated to pious uses, and no trustees created, the grantors are trustees; and this authority, as well as the visitatorial power, permits the expulsion of a stranger. *Dartmouth College v. Woodward,* 4 *Wheat.* 518.

*Shepley, on the same side.* As the case does not shew that the plaintiffs have broken the conditions of the grant to them, the presumption is that the conditions were performed, and that the plaintiffs were seized in fee of the lands demanded; and the question is, have they *divested* themselves of the estate?

1. The grant of *September* 8, 1780 is to be treated as void; upon the principle that every grant is void, if there is no person *in esse* to take. It does not appear that there was at the time of

Shapleigh *v.* Pilsbury.

the grant, or ever has been, a congregational minister, church, or parish, in the easterly part of *Shapleigh.* 4 *Cruise's Digest* 14. *Pawlet v. Clark,* 9 *Cranch* 318. 330. *Baptist association v. Hart's ex'rs,* 4 *Wheat.* 1.

2. But supposing, for sake of argument, that the grant was good; in whom does the fee continue, until some person be *in esse* capable of taking? There being neither minister nor parish, and it being essential to a grant that the estate be in the care and custody of some person, it follows that the grantors must be seized, to the use of the person or corporation which may come *in esse* to take the land. *Rice v. Osgood,* 9 *Mass.* 44. *Brown v. Porter,* 10 *Mass.* 93. *Pawlet v. Clark,* 9 *Cranch* 318.

3. The words of the grant fortify this conclusion. The lands were appropriated for the use of the ministry " *so soon*" as there shall be a minister ordained and settled. They are *designated* now,—to pass from the grantors when the contingency shall happen. And this is in perfect agreement with the terms of the grant to them of *October* 30, 1782, by which the lands already appropriated to public uses should be truly reserved to those purposes :—in other words, the lands already designated for the use of the gospel ministry, were to be kept in the hands of the proprietors, and protected from waste, until a minister should be ordained, or a parish created, capable to take them. Nor is this construction at variance with the settled principles of the law. *Wallis v. Wallis,* 4 *Mass.* 135. *Pray v. Pierce,* 7 *Mass.* 384.

If we are well founded in these positions, the right of possession has always been in the grantors, and actual possession follows of course till an adverse possession is proved; which, in the present case existed only for a few years. It was of no importance that the proprietors should enter in order to entitle them to this action, because they were in the actual possession at the time the tenant entered and disseized them.

*Emery, for the tenant.* The proprietors, by their votes of *September* 8, 1780, and *December* 8, 1784, performed every act necessary to pass the whole estate out of their corporation. The estate, therefore, ought not to be supposed to remain in the grantors against the terms of their own grant, unless such a con-

struction is rendered necessary by plain and inviolable princi-
ples of law.    But these rules, so far from favouring this construc-
tion, are against it.   It is settled that at common law lands may
be granted to pious uses before any person is in existence com-
petent to take them, and in the mean time the fee is in abeyance.
*Pawlet v. Clark*, 9 *Cranch* 292.    *Weston v. Hunt*, 2 *Mass.* 500.

If then the estate has passed out of the grantors, they cannot
resume it unless there has been a forfeiture.

Nor is it left destitute of a guardian.    It vested in the eastern
parish at its creation, and the inhabitants of this parish have the
custody of the land and receipt of the profits, and are bound to
protect it from waste, until a congregational minister shall be
settled.    *Brown v. Porter*, 10 *Mass.* 93.    *Dillingham v. Snow*, 5
*Mass.* 555.    *Brown v. Nye*, 12 *Mass.* 255.    *Brunswick v. Dun-
ning*, 7 *Mass.* 445.

A different construction involves great inconveniences.    If
the estate has not passed from the proprietors, they may parti-
tion it among themselves.    Or suppose the corporation dissolv-
ed ; the land might descend and be divided among their heirs,
extensive improvements may be made on it ;—and if a minister
should be settled and claim the land, shall he hold the improve-
ments also ?    Or may he abandon the land to the tenant at the
value in its natural state, pursuant to the statute of 1820. *ch.* 47.
thus effecting a sale without the assent of his parish ?    And if he
elect to retain the land, and pay the tenant for its increased
value by reason of the improvements, by what process is he to
obtain funds for this purpose ?

These positions are fortified by adverting to the *Stat.* 1782.
confirming the land to the proprietors upon conditions, to which
they assented, and set apart the reserved lands accordingly.
The confirmation enures to the benefit of the party for whose
use the reservation was made.    It could not enure to the pro-
prietors, for their votes are an estoppel ; and if not to the *cestui
que use*, then it enures to no one, and the fee is not in the
demandants, but in the State.    In this view of the case, the
State, by *Stat.* 1782, consecrated to pious uses such of *its own*
lands as the proprietors might designate ; and upon the demand-
ants' principles, the State, and not the proprietors, was the
grantor, possessed the visitatorial power, and is entitled, if any
one is, to maintain the present action.

MELLEN C. J. now delivered the opinion of the Court, as follows.

In those cases respecting grants or donations of lands to the use of the ministry, to which we have been referred in the argument, or to which our researches have extended, the question has been between persons or corporations claiming under such grant or donation, and third persons, *strangers* thereto. In no instance have we found the action brought by the original grantors with a view of reclaiming the estate, or regaining and holding the possession of it, on the ground that the fee did not pass by the grant or instrument intended to convey it.

In the case at bar, the original grantors are seeking to reclaim and repossess the estate granted by them ; proceeding on the idea that they are lawfully entitled to take the custody and income, until the event contemplated in the grant shall have taken place,—viz. the existence of a congregational minister and parish, or at least a parish, in the east part of the town of *Shapleigh,* now the east parish. It is admitted that such a parish does not exist, and never has existed there. The question, therefore, which the facts in this case present, does not appear to have been expressly decided ; though we apprehend that we are furnished with principles in many decided cases, relative to ministerial or glebe lands, which will lead us to correct and legal conclusions.

It seems to be agreed that the demanded premises *were once* the undisputed property of the demandants; and it appears by the report of the Judge that the tenant has no title to them other than possession.

On these facts it is contended by the counsel for the demandants, in the *first place,* that the grant by the proprietors in the year 1780 of the demanded premises is void, because there was at that time no person or corporation capable in law of taking the estate granted ; and that of course the allotment in 1784 is also void as to the lots of land in question :—and in the *second place,* that if the grant and allotment be good and valid, still, in the circumstances of this case the demandants have a right to the custody and possession of the lands so granted and allotted, until they shall be appropriated and possessed in the manner and for the purposes mentioned or intended in the grant; and

Shapleigh v Pilsbury.

ⱻf course that they may rightfully maintain this action against a stranger who has intruded himself into the lands, to the prejudice of all who have any legal interest therein.

With respect to the *first point* we apprehend that the objections urged by one of the demandants' counsel are not so substantial as he seems to have considered them. We are not disposed to doubt the correctness of the principles on which the numerous cases he has cited are founded; but we do not consider them as applicable to the present case, or to grants or donations of land to the use of the ministry. It is not necessary therefore particularly to discuss them. We are not aware that such grants or donations were ever considered void and inoperative, either before or since the revolution, on the principle that no person or corporation, capable of taking, existed at the time of the grant. Should such a principle be considered as sufficient to defeat such grants, it would in numberless instances frustrate the benevolent intentions of the legislature, or of generous individuals, in the bestowment of their bounty. But we are not without authorities on this point. In *Rice v. Osgood*, 9 *Mass.* 38. the Court speak of the manner in which estates granted for ministerial purposes vest, when the corporation for whose use and benefit they are intended is not *in esse* at the time of the grant; and in the case of *Brown v. Porter*, 10 *Mass.* 93. the nature of such grants and donations is particularly considered and explained by the late Chief Justice *Sewall*, in delivering the opinion of the Court. To the same point also is the case of *Pawlet v. Clark*, 9 *Cranch* 292. But we need not any farther consider the validity of the grant made by the proprietors, because if the *second* ground on which the demandants proceed can be maintained, the validity or invalidity of the grant is of no importance. If it be void, then the demandants are entitled to judgment : or if the grant be valid, and yet the demandants are in law authorized to hold the possession and custody of the demanded premises till a grantee shall exist capable of taking according to the grant, the same consequence will follow, and judgment must be entered on the verdict.

The demandants contend that the fee of the lands granted still remains in them, because neither the person nor the corporation for whose use the grant was made is yet *in esse*. For the

tenant it is contended that at the time of the grant the fee *passed* from the proprietors, and has ever since remained, and now re- mains, in *abeyance;* that consequently the demandants cannot now reclaim the estate, or recover the possession and retain the custody of it; and that they have no controling power over the lands granted, or interest in, or right to possess them.

It becomes necessary to examine this doctrine of *abeyance* with some attention, in order to ascertain the merits of the de- fence as founded on the principle that the fee of the demanded premises passed out of the proprietors at the time of the grant, and has ever since remained and now remains in abeyance.

Abeyance is said to be " a fiction in law —— allowed only " where necessary, and to avoid an absurdity or inconvenience, " and for the benefit of a stranger, to preserve his right." " The " law does not allow it but where the original creation of estates " or where the consequence of estates and cases do in congruity " require it." *Vin. Abr. Abeyance A.* 2. 3.

Devise to *A.* for life, and if *A.* have issue male, then to such issue male and his heirs forever; and if *A.* leave no issue male, then to *B.* in fee. It was held by *Ld. Ch. J. Parker* that since construing the fee to be in abeyance would tend to destroy it, and since *nothing but necessity in any case should occasion a fee simple to be in abeyance*, he should abide by the opinion which had been given, that where the remainder was devised in con- tingency, the reversion in fee *descended to the heirs at law in the mean time. Vin. Abr. Abeyance B.* 15. 1 *P. Wms.* 505. 511. 515.

In the case of *Vick v. Edwards,* 3 *P. Wms.* 372. lands were devised to *B.* and *C.* and the survivor of them, and the heirs of such survivor, in trust to sell. *Ld. Chancellor Talbot* held that the fee was in abeyance. But it is laid down in note 78. to *Co. Lit.* 191. *a. Title.* " Tenants in common," that notwithstanding the case of *Vick v. Edwards* it seems *now* to be the prevailing opinion that in these cases the fee is not in abeyance, but re- mains pending and subject to the contingency, *in the grantor and his heirs;*—that there is something *undisposed of,* viz. the inter- mediate estate, until, by the death of one of the parties the re- mainder vests; and that therefore this intermediate estate con- tinues in the grantor, the law never supposing the estate to be in

Shapleigh *v.* Pilsbury.

abeyance, unless where it is necessary to recur to this construction for preserving some estate or right. The case of *Purefoy v. Rogers,* 2 *Saund.* 380. and others, are mentioned as strongly favouring this later opinion. " In case of a *devise* to the effect in question, the reversion in fee descends to the heirs of the devisor, during the suspension of the contingency." *Co. Lit.* 191. *a.* [*note* 78.]

*Mr. Fearne,* in his learned treatise on Contingent Remainders, &c. *ch.* 6. has entered fully into an examination of the doctrine of abeyance, and with much force of reasoning has laboured to shew that in those instances where the estate has been supposed to be in abeyance, the fee does in fact remain in the grantor or devisor or their heirs ; and the prevailing opinion is in favour of the conclusions which he has drawn from the adjudged cases. In support of the principle he is establishing he cites *Sir Edward Clere's case,* 6 *Rep.* 17. *b. Leonard Lovie's case,* 10 *Rep.* 78. 85. *b. Beck's case, Lit. Rep.* 159. 253. 285. 315. 344. *Cro. Car.* 363. *Carth.* 262. in which it was said by *Holt* that in case of feoffment to the use of *A.* in tail, remainder to the right heirs of *J. S.* then living, the fee simple is not in abeyance, nor in the feoffees, but results to the grantor and remains in him, until the contingency happens by the death of *J. S.* Also *Plunket v. Holmes, Raym.* 28. and 1 *Rep.* 68. *Archer's case,* both of which settle the same principle. Also *Purefoy v. Rogers,* 2 *Saund.* 380. where there was a devise to wife for her life, with contingent remainder to son ; and *Hale C. J.* said it was clear that the reversion was in the heir of the testator by descent, and not in abeyance. The case of *Carter v. Barnardiston,* 1 *P. Wms.* 505. was a devise to C. for life, and in case C. should have issue male, then to such issue male and his heirs forever ; and after the death of C., in case he should leave no issue male, then to *D.* in fee. The master of the Rolls considered the fee in abeyance ; but on appeal, *Ld. Chan. Parker* " made a point of reprobating and exploding that notion, and held that nothing but necessity could, in any case, support the admission of it ; and he overruled the opinion of the master of the Rolls." The case of *Loddington v. Kime,* 1 *Salk.* 224. 1 *Ld. Raym.* 209. supports his decision.

*Mr. Fearne* contends that the inheritance continues in the

grantor when a remainder of inheritance is created, in convey-
ances *at common law*, as well as in conveyances by way of use,
and dispositions by will. In support of this principle he cites **2**
*Rol. Abr.* 418. *Co. Lit.* 216. *a.* 217. 218. *a.* relating to the en-
largement of estates upon condition, and the cases there cited,
to shew that " there was no such universally allowed absurdity
" in the texture of the common law, as to prevent the inheritance
" from continuing in the grantor, where there was no passage for
" its transition open at the time of the livery." See also *Hale's*
opinion in *Colthirst v. Bejushin, Plowden* 31. *a.* *Gilbert*, speaking
of a lease for life, remainder to the right heirs of *J. S.* then liv-
ing, and adopting the principle of abeyance, says, " all remain-
" ders must pass out of the donor at the time of the limitation".
And then considering a case where the remainder could never
vest, he observes, " as to the feoffor, he or his heirs were still *in*
" *esse ;* and since the grantee could not take the remainder, and
" no other person had a right to claim it, it *must return back*
" *again and settle in the feoffor, as if no disposition had been made.*"
Upon this *Fearne* observes, " Now what does such an answer to
" the objection plainly amount to, more or less than that the
" feoffor and his heirs still continued tenants to the lord ; be-
" cause neither the grantee, nor any other person in the world,
" having any right under the limitation of the remainder, it was
" as much out of the case, and the feoffor and his heirs as fully
" entitled, as if it had never been made. To whom then could
" it ever have passed out of the grantor ? and from whom could
" it ever return to him ? Where is the sense in saying that a
" remainder must pass out of the grantor, in a case where you
" deny it ever passed at all to the grantee, or any body else ?
" Would there not be better sense in considering the disposition
" itself, in all these cases, as put in suspense till the event or con-
" tingency referred to decides its effect ? What is there to move
" the subsisting estate in the lands from the grantor, before the
" alienation takes effect ? That *alienation* may indeed vest in
" abeyance, or expectation, till the contingency or future event
" gives it operation ; and it is *that,* rather than the respited *in-*
" *heritance,* to which, during its mere potential, undecided opera-
" tion, the allusion of *caput inter nubila condit* seems most applica-
" ble. In short, to bring this doctrine to the test of reason, we

Shapleigh *v.* Pilsbury.

" may state it thus : A man makes a disposition of a remainder,
" or future interest, which is to take no effect at all until a future
" event or contingency happens.   It is admitted that no interest
" passes by such a disposition to any body before the event
" referred to takes place.   The question is, what becomes of the
" intermediate reversionary interest, from the time of the mak-
" ing of such future disposition, until it takes effect ?   It was in
" the grantor or testator at the time of making such disposition :
" It is confessedly not included in it :   The natural conclusion
" seems to be, that it remains where it was, in the grantor or
" testator, or his heirs, for want of being departed with to any
" body else.   Who can derive a title to an estate under a pros-
" pective disposition, which confessedly never takes any effect ?"

Before examining any of the decisions of the Courts in our own
country, it may be proper here to observe that in the numerous
cases cited, a *portion only* of the estate, viz. a *remainder*, was to
vest on a contingency, which contingency was clearly expressed
in the conveyance or devise.   But in the case at bar no contin-
gency is expressed in terms ; and the whole estate was granted
and was to vest at the same time, and in the same grantee, when-
ever such grantee should come into existence to take the estate
granted.   Still, we apprehend, there is no difference between
the cases cited and the case before us, in regard to the applica-
tion of the doctrine of abeyance, or rather of the principles op-
posed to that doctrine.   The grant of the demanded premises
was not expected or intended to take complete effect till, and so
soon as, such a grantee should be *in esse* as the grant contem-
plated, and such an one might never exist ; certainly none such
is yet in being.   The event on which the estate granted was to
take effect was known to be distant and contingent ; and thus
far the present case resembles those which we have examined ;
and as to the other point of supposed difference, it seems plain
that if the fee of a *remainder* continues in the grantor till the con-
tingency happens, because *that only* depends on the contingen-
cy ; for the same reason the fee of the *whole estate* must remain
in the grantor, till the event or contingency happens, when such
contingency relates to and is designed to affect the whole estate.

In the case of *Rice v. Osgood*, 9 *Mass.* 38. *Sewall, C. J.* in de-
livering the opinion of the Court, says, " When a patentee ac-

" cording to the condition of the grant to him, makes a grant or
" assignment, the estate vests where the appropriation is to a
" person or corporation *in esse*, and is accepted by him or them ;
" and where contingent and to a person or corporation not *in*
" *esse*, the estate remains in the patentee until the contingency
" happens, and then vests, if accepted." In that case a town-
ship had been granted by the General Court to one *Brown*, on
condition, among other things, that he should give bond to the
treasurer to assign one sixty-fourth part *to the use of the ministry*,
and *Rice*, the settled minister, claimed the sixty-fourth part in
right of the town, for the use of the ministry.

In *Weston v. Hunt*, 2 *Mass.* 500, the Court say, " the minister
" holding parsonage lands in fee simple, holds them in right of
" his parish or church ; and therefore, on his resignation, depri-
" vation or death, the fee is in abeyance." And again—" If
" there be a minister, the fee is in him ; and if there be a va-
" cancy, the fee is in abeyance."

In the case before mentioned of *Brown v. Porter, Sewall C. J.*
in delivering the opinion of the Court, observes—" Lands thus
" given and appropriated to pious uses are holden by the min-
" ister of the parish or corporation for whose use and benefit
" the gift or appropriation is made, as an estate in fee simple to
" him and his successors, taking the same upon a regular settle-
" ment and ordination as a sole corporation ; and *until such ap-*
" *pointment*, and *during vacancies* in the ministry, the estate be-
" ing in abeyance,—but in the custody of the parish"—&c.

It will be observed that the Court, in neither of the two last
mentioned cases, are explicit as to the situation of the fee be-
tween the time of the grant and the creation of the contemplat-
ed parish or corporation for whose use the grant is made; or
whether during that interval the fee is to be considered in abey-
ance. Those cases seem to go no further than to show that
when a parish has been formed, and had the legal custody of
the land, the fee is in abeyance until the appointment of a min-
ister ; and so it is after a minister has been seized, and is dead
or has resigned, &c.—the fee is in abeyance, and the parish has
the custody.

Neither did the facts in *Pawlet v. Clark* render it necessary to
draw the line with precision ; because some years before the

commencement of the action, a Church existed in the town, of the kind contemplated.

Fictions of law are always designed to answer the purposes of Justice; but are not permitted to prejudice rights or to work injury to any one. Their object is to preserve, not to defeat, an estate;—to effectuate, not to thwart, intentions evidently expressed in a conveyance. Hence the fiction respecting the abeyance of the fee is never to be admitted, when its tendency would be to defeat a remainder. *Fearne* 355. And there is still less reason for viewing the doctrine with favour, in the case before us, where it would not only go to endanger the estate granted, by leaving it without protection and without an owner; and when on the contrary, by considering the fee as remaining in the demandants, they will guard it from destruction and preserve it for its destined uses.

It will be recollected that in the case before us the grant by the proprietors was made in the year 1780; and that on their application the legislature of *Massachusetts* on the thirtieth day of *October* 1782, confirmed to them the lands contained in the town of *Shapleigh* on condition " that the several lots in said " tract before described already appropriated to public uses be " truly reserved for those purposes." So that the lands in question have been granted and secured for the use of the ministry, in effect not only by the proprietors of *Shapleigh*, but by the Commonwealth of *Massachusetts*. And taking the grant by the proprietors, and the confirmation by the legislature into view, in connection, the case seems in essence to be like that of *Rice v. Osgood*, and the grant to be like that to *Brown* upon *condition* to assign a certain part of the granted premises *to the use of the ministry.* And in that case *Sewall C. J.* has declared the fee to remain in the patentee *Brown*, till the contemplated parish and minister were *in esse* to take it.

In the argument the case of *Pawlet v. Clark* has been cited; and it deserves particular consideration, as it furnishes much useful learning on the subject of ministerial lands, and the principles of law applicable to property of that description. Some passages in the opinion of the Court delivered by *Mr. Justice Story* may at first view seem to militate against the opinions of the Supreme Judicial Court of *Massachu-*

*setts* in the cases before cited; but on a close examination we apprehend there will be found no essential difference. His words are—" From this brief history of the foundation of par-" sonages and churches it is apparent that there could be no " spiritual or other corporation capable of receiving livery of " seizin of the endowment of a church.—There could be no par-" son, for he could be inducted into office only as a parson of an " existing Church, and the endowment must precede the estab-" lishment thereof. Nor is it even hinted that the land was " conveyed in trust; for at this early period trusts were an un-" known refinement. The land therefore must have passed out " of the donors, if at all, without a grantee, by way of public " appropriation and dedication to pious uses. In this respect it " would form an exception to the generality of the rule, that " to make a grant valid there must be a person *in esse* capa-" ble of taking it; and under such circumstances, *until* a par-" son should be legally inducted to such new Church, the " fee would remain in abeyance, or be like *hœreditas jacens* " of the Roman code, in expectation of an heir." He goes on afterwards to observe—" For the reasons, then, which " have been given, a donation by the Crown for the use " of a *non-existing* parish Church, may well take effect by the " common law as a dedication to pious uses.—And after such a " donation it would not be competent for the Crown to resume it " at its own will, or alienate the property *without the same consent* " which is necessary for the alienation of other church-proper-" ty.—Before such Church were duly erected and consecrated, " the fee of the glebe would remain in abeyance, or, at least, " beyond the power of the Crown to alien, without the ordinary's consent." The argument of the learned Judge is intended to establish the point that a grant to a *non-existing* parish and minister is not void; and that the King or the State, after having made such a grant, cannot legally *resume* the lands, and *re-grant* them, without consent. In supporting such a grant, in one place he observes that the fee is in abeyance, or at least is beyond the power of the Crown to alien without consent. Undoubtedly this is sound law; and if the effect of a judgment in this action in favour of the demandants would amount to a *resumption* of the grant. and an authority to convey the premises to any *other per-*

Shapleigh v. Pilsbury.

*son* or corporation, or for any *other uses*, then the case of *Pawlet v. Clark* would be a direct authority in favour of the tenant. But no such authority is claimed in the present instance ; no intention of reclaiming the granted premises for the purpose of future disposal is avowed. A right is asserted only to recover possession and retain the custody of the premises, until the contemplated grantee shall be *in esse* to take. But if the demandants did claim to recover the premises with the express intention of alienating them to other uses, still such intention could not affect any legal rights ; because, should the demandants obtain judgment and enter into possession of the lands demanded, yet they would be obliged to surrender such possession when such a parish and minister shall appear to take as the grant contemplates ; and such minister, declaring on his own seisin in right of such parish, could maintain an action against the present demandants, for the premises which they may recover in this action. The verdict in this action would not be evidence in a suit by the future minister.

The object in view when the grant was made will be attained, and its beneficial purposes accomplished, if the estate be delivered up by the grantors to the contemplated grantees, so soon as they shall come into existence, to take and improve it for the uses specified ; and from the very nature of such grants or dedications, it must be presumed that it was the intention of the grantors that the estate should remain in their custody and possession, until it should be wanted and improved for the beneficial purposes prescribed. Until such time shall arrive, who else has any authority to interfere with the property ? Who can feel the same disposition to preserve the estate from depredation or injury, as the grantor or donor ? Who can have less temptation to impair the value of the lands thus granted, than the man or the proprietors who have made the grant from commendable motives and for wise ends ? And why should the Court be called upon to look with a favourable eye to the situation of the tenant, who has no title whatever to the lands demanded, and whose possession may essentially injure the property ? He can have no right to the custody of the lands, nor any claims except those of every wrong-doer.

For the purposes, then, of giving full effect to the grant of the proprietors, and preserving the estate granted for the uses intended, we ought to consider the fee as remaining with the grantors ; and there seems as good reason for such construction as in the cases before cited. It is a fiction, if it may be so called, giving effect both to contract and intention, and calculated to produce beneficial effects ; whereas by considering the fee as entirely out of the grantors, and in abeyance, the estate will be left, during the interval between the grant, and the existence of a grantee to take, in a defenceless state, unguarded and exposed ; in the possesion and custody of no one, and liable to depredation by all.

But there is another ground on which the demandants are entitled to judgment. It is either admitted or proved beyond question that at the time of the grant, the general tract, composing what is now the town of *Shapleigh* of which tract the demanded premises are a part, was the undisputed property of the proprietors of *Shapleigh*, the present demandants, whose seisin and possession of the lots in question continued uninterrupted till the entry and occupation by the tenant, which was about five years before the commencement of this suit ; and, as before stated, the tenant has no title whatever. On these facts he cannot defend himself. For when the demandants had established their title and seisin within thirty years next before the date of the writ, it was not competent for the tenant to shew that the title was out of them by their conveyance, or by them transferred to any person or corporation, unless he claimed and derived title under such person or corporation by legal conveyance or operation of law. This is a common principle, well known and familiar. We will refer, on this point, to the single case of *Wolcott v. Knight*, 6 *Mass.* 418. The general issue is pleaded in this case as it was in that. Therefore, if the tenant, instead of labouring to shew that the demandants, by their grant of the demanded premises to pious uses, had placed the fee in abeyance for want of a proper grantee to take, had been able to shew a grant to a proper person or corporation then *in esse* and capable of taking, still such proof would have been improper and unavailing, unless he could have legally connected himself with, and derived a title from, such person or corporation.

The result of our investigation is, that the right to the possession and custody of the lands belongs to the grantors, till grantees, of the character designated in the grant, shall come into existence, who will then have a right to enter upon and hold the estate. Accordingly the present action is maintainable and by the terms of the agreement of the parties, there must be

*Judgment on the verdict.*