**OPINION OF THE JUSTICES of the Supreme Judicial Court Given Under the Provisions of Section 3 of the Article VI of the Constitution.**

Questions Propounded by the Senate in an Order Dated May 25, 1973.

Supreme Judicial Court of Maine.

June 21, 1973.

260

## ANSWERS OF THE JUSTICES

To the Honorable Senate of the State of Maine:

In compliance with the provisions of Section 3 of Article VI of the Constitution of Maine, we, the undersigned Justices of the Supreme Judicial Court, have the honor to submit answers to the questions propounded on May 25, 1973.

The origins, and continuing creation, of the "public lots" in Maine stem fundamentally, as disclosed by the Statement of Facts, from provisions of Item Seventh of the Articles of Separation operative in two respects: (1) to

"continue in full force, after the . . . District [of Maine] shall become a separate State"

the status of land titles created by Massachusetts by virtue of

"all grants of land . . ., and all contracts for, or grants of land not yet located which have been or may be made by the . . . Commonwealth, [of Massachusetts] before the separation . . . shall take place, . . ."

and (2) directing that

" . . . in all grants hereafter to be made by either state of unlocated land within . . . [Maine after the separa-

tion], the same reservations shall be made for the benefit of Schools, and of the Ministry, as have heretofore been usual, in grants made by . . . [the] Commonwealth [of Massachusetts]."

Thus, the Articles of Separation are the logical starting point of analysis. Although we have been asked to provide answers to several questions propounded in seriatim sequence, we think it appropriate to present, preliminarily, a unified exposition of the meaning, and legal consequences, of the concepts of Item Seventh of the "Articles" which have material bearing upon the "public lots."

The Statement of Facts recognizes that the "Articles" are not only "terms and conditions" fixed by the Commonwealth of Massachusetts and "agreed and consented" to by Maine in becoming a separate State but also, as here relevant, have become incorporated as provisions of Maine's Constitution. As a part of the Constitution of this State, identified as Article X thereof, Item Seventh of the "Articles" is the delineation of long range controls which the people of Maine have themselves imposed upon all of the State's branches of government, including the legislative, through which the sovereign power of the people will be exercised.

The initial issue for analysis, therefore, becomes the nature of the limitations con-

templated by Article X of the Constitution of Maine insofar as the "public lots" have been created by "reservations" constitutionally acknowledged effective as they had been made by Massachusetts prior to separation and constitutionally directed to be brought into existence by Maine (or Maine and Massachusetts acting jointly) after separation.[1]

The core subsidiary question, here, is the meaning imported by the constitutional concept of a "reservation"—in particular, the legal consequences produced by it once it has been effected.

■ One year after Maine had become a State, the Supreme Judicial Court of the new State in Shapleigh v. Pilsbury, 1 Me. 271 (1821) directed its attention to this subject. After a careful review of approaches taken by the Massachusetts Court in the case of Rice v. Osgood, 9 Mass. 38 (1812) and Brown v. Porter, 10 Mass. 93 (1813), in conjunction with the attitude expressed by Mr. Justice Storey on behalf of the Supreme Court of the United States in Pawlet v. Clark, 9 Cranch (13 U.S.) 292, 3 L.Ed. 735 (1815), the Maine Court strongly indicated the view that the "reservation" process produces the legal consequence that the sovereign, as a grantor "reserving" lands for designated beneficial purposes and as to which specific beneficiaries to take the legal title are not in existence, has created no vested rights in private persons but has effectively subjected itself to a legal restriction; it has removed the "public lots" from its dominion as an absolute proprietor and has denied itself

" . . . an authority to convey the premises to any other person or corporation, or for any other uses, . . ." (Shapleigh, supra, 1 Me. pp. 288, 289)

Further, it may fairly be concluded that such doctrine was given continuing approval in the subsequent cases of State v. Cutler, 16 Me. 349 (1839); Dillingham v. Smith, 30 Me. 370 (1849); Dudley v. Greene, 35 Me. 14 (1852); Mace v. Land & Lumber Company, 113 Me. 420, 92 A. 486 (1914); and Flye v. First Congregational Parish, 114 Me. 158, 95 A. 783 (1915).

The case of Union Parish Society v. Upton, 74 Me. 545 (1883) is not to the contrary. Its discussion, by way of dictum, conceding that the effect of a "reservation" is to impose "great moral and political" strictures does not exclude the existence of legal obligations.

In State v. Mullen, 97 Me. 331, 54 A. 841 (1903) this Court characterized the "reservation" process and its consequences as follows:

"Prior to the separation of Maine from Massachusetts, the latter State, in making grants or sales . . ., had generally pursued the policy of making reservations of lands for public uses from the lands granted. The beneficiaries of these public uses were not ordinarily in esse at the time of the grant. *Massachusetts retained the legal title for the use of the beneficiaries when they should come into existence*. After the separation, as held in State v. Cutler, 16 Maine, 349, this state by *virtue of its sovereignty* became *entitled* to the care and possession of these reserved lands [in the place of Massachusetts] . . . the State [of Maine] became *trustee* . . . ." (p. 335, 94 A. p. 843) (emphasis supplied)

■ The accumulated past expressions of this Court lead us, therefore, to the conclusion that the meaning and legal effect

---

[1]. By thus concentrating attention upon the Articles of Separation in this aspect as a part of the Constitution of Maine, we intend no suggestion that the "Articles" are without independent legal effectiveness as limitations upon the sovereignty of the State of Maine imposed by the Commonwealth of Massachusetts. Cf. Green v. Biddle, 8 Wheat. (21 U.S.) 1, 5 L.Ed. 547 (1823). As the ensuing discussion will disclose, our undertaking to answer the questions propounded need not involve an investigation of this facet of the Articles of Separation.

**270** ◼

of a "reservation", as contemplated by Article X of the Constitution of Maine, is that thereby the sovereign removes the lands "reserved" from the public domain and must continue to hold and preserve them for the "beneficial uses" intended.

Insofar as Article X embodies the "reservation" process and consequences thereof in the specific context of (1) rendering Maine bound by such "reservations" as Massachusetts had made prior to separation and (2) specifies for the future, after separation, that if Maine makes grants of land from its public domain "reservations" shall be effectuated in such grants for beneficial purposes according to usages which had prevailed in the Commonwealth of Massachusetts prior to separation, the Maine Constitution subjects the Legislature of Maine to the limitation that it treat all "public lots"—i.e., those already, or to be, created by "reservations"—on the principle that the Constitution requires the "public lots" to be held and preserved for the beneficial uses intended.

Pursuant to this approach, the additional issue arises concerning the nature of the beneficial uses constitutionally tolerable under the language of Article X of the Maine Constitution.

As to the direction that "reservations" in future grants after separation

"shall be . . . for the benefit of Schools, and of the Ministry, as have heretofore been usual, in grants made by . . . [the] Commonwealth [of Massachusetts]",

the specific inquiry is: are the two beneficial uses particularly designated, i.e.,

"Schools" and "Ministry" intended to be exclusive limitations or merely illustrative of a more comprehensive assemblage of beneficial purposes "usual" in "reservations" made by Massachusetts prior to separation?

We believe the latter is the correct interpretation of the constitutional language.

The Colony of Massachusetts Bay, and later the Commonwealth of Massachusetts, maintained a policy of reserving, from grants of public land, certain lots for named public uses. While the local ministry and local schools were named as public uses, lots were also reserved for, *inter alia* Harvard College,[2] the

> "benefit of public education in general, as the General Court shall hereafter direct" (State v. Cutler, 16 Me. 349, 352 (1839) ),

and the further appropriation of the General Court.[3] The lands reserved by Massachusetts under its policy were not, therefore, restricted only to use for the ministry and for schools.

The Maine Legislature itself, shortly after separation, responded to the constitutional requirement of Article X by enacting P.L. 1824, Chapter 280, providing that 1,000 acres be reserved from each township or six-mile tract for "such public uses . . . as the Legislature may hereafter direct." The statute, enacted so soon after the adoption of the Constitution, indicates that when the adoption of the Constitution was a fresh memory, the reservation clause was not construed as restricting uses to schools and the ministry. Additional evidence that the statute of 1824 was viewed as consistent with the Constitution is the

---

2. Resolve of May 1, 1776, Chapter 12 [1776–77] 5 Acts & Resolves of the Province of Massachusetts Bay 666.

3. Resolve of March 26, 1788, Chapter 80 [1787–8] Mass. Resolves 123; Resolve of February 4, 1790, Chapter 68 [1789–0] Mass. Resolves 58. In addition to its policy of reserving lands, Massachusetts sought to afford public benefits through

a policy of direct grants. The public benefits advanced by these grants include both the ministry and education and also such uses as the protection of beaches and harbors. O. Handlin & M. Handlin, Commonwealth: A study of the Role of Government in the American Economy (Massachusetts, 1774–1861) 80 (Rev. ed. 1969).

fact that no effort was made to procure parallel legislation in Massachusetts.[4] The statute of 1824 was viewed as working no change upon constitutional requirement for the use of public lots.

Grants of public land by the State of Maine under the 1824 statute contained a reservation for "public uses." It is significant that grants of townships by Maine and Massachusetts acting jointly also contained reservations for "public uses" rather than reservations restricted for use of schools and the ministry.[5] This indicates that both states viewed the reservation for "public uses" to be consistent with the usual reservations made by Massachusetts prior to Maine statehood.

■ In light of the practice of Massachusetts prior to Maine statehood, the legislative response of Maine soon after statehood, and the joint action of the two States, it is evident that the uses mentioned, i.e., schools and the ministry, concerning reservations to be made after separation are illustrative, and not an exclusively exhaustive listing, of the "public uses" for which "reservations" are to be made.

We regard this principle as controlling, also, concerning "reservations" made prior to separation and in which, since the contemplated beneficiary had not come into existence, the "reserved" lands had not become appropriated to any particular uses designated. In such posture, the only obligation upon the sovereign is to hold and preserve the lands "reserved" for those "public uses" generally reflected by the usage of Massachusetts and of which any particularly designated use provides only an example. See: Union Parish Society v. Upton, 74 Me. 545, 546–548 (1883).

■ The foregoing general analysis provides the foundation for answers to the specific questions propounded as follows.

QUESTION NO. I: Do the provisions of Section 5 of the Act violate the Articles of Separation, the Distribution of Power provisions or the Due Process Clauses of the Federal or State Constitutions?

ANSWER: We answer in the negative.

QUESTION NO. II: If the answer to the preceding question is that any of the provisions of Section 5 of the Act violate the Articles of Separation, would such provisions be constitutional upon consent to such provisions by the Legislature of Massachusetts?

ANSWER: Since the answer to Question No. I is that the Articles of Separation are not violated, this question is rendered inapplicable.

QUESTION NO. III: Do the provisions of Section 7 of the Act violate the Articles of Separation, the Distribution of Power provisions or the Due Process Clauses of the Federal or State Constitutions?

ANSWER: We answer in the negative.

In providing this answer, however, we emphasize that we are interpreting the provisions regarding the State's title to the public lots, ownership of future earnings attributable thereto and its management and preservation of them as "State assets" —all as appearing in Section 7,—to contemplate recognition of the principle enunciated in the preliminary general discussion that the "public lots" are not part of the public domain over which Maine has absolute proprietorship but must be held and preserved for the generalized "public uses" contemplated by the Articles of Separation.

---

4. Article X, Section 5, Paragraph Ninth provides that modification of any of the terms of Article X, Section 5, may be made only with the consent of the Massachusetts General Court.

5. E. g., Deed from Maine and Massachusetts conveying T8R13 to Samuel Smith, July 16, 1844. 2 Deeds-Maine and Massachusetts at 47. (State Archives, Augusta, Maine).

QUESTION NO. IV: If the answer to the preceding question is that any of the provisions of Section 7 of the Act violate the Articles of Separation, would such provisions be constitutional upon consent to such provisions by the Legislature of Massachusetts?

ANSWER: Since the answer to Question No. III is that the Articles of Separation are not violated, this question is rendered inapplicable.

QUESTION NO. V: Do the provisions of Section 14 of the Act violate the Articles of Separation, the Distribution of Power provisions or the Due Process Clauses of the Federal or State Constitutions?

ANSWER: We answer in the negative.

Our answer that neither the Articles of Separation nor the Distribution of Power provisions of the Federal or State Constitutions are violated is amply clarified by the preliminary exposition we have presented.

Our answer that the Due Process Clauses of the Federal and State Constitutions are not violated requires further discussion.

Partition, or location, of "public lots" hitherto unlocated in lands which have become privately owned can precipitate questions of constitutional "due process" insofar as rights already vested in private persons may be affected by the criteria and methods utilized to accomplish the partition, or location—in particular, if the Legislature has seen fit to alter the prior law governing at the time private ownership was acquired.

Section 14 retains the foundational criterion for the partition and location of "public lots" first promulgated in 1824 that, as partitioned or located, the "public lots" shall be " . . . average in quality and situation with the other land . . . ." Section 14 further specifies, however, that over and above one subsidiary aspect of "average in quality and situation" previously specified—i. e., "value as to timber and minerals"—other factors shall hereafter be taken into account. We cannot project that such requirement will, or must, per se cause a landowner to lose property on a basis sufficiently different from what would arise by the applicability of such law as governed when ownership rights were acquired to constitute it a retrospective impairment of vested private rights in violation of "due process of law." For this reason, Section 14, taken on its face, is consistent with the Due Process Clauses of the Federal and State Constitutions.

In the context of an advisory opinion we are able to evaluate Section 14, relative to the question propounded, only by considering the language of Section 14 on its face and not with the assistance of particular factual contexts in which it might be applied. Hence, we answer that Section 14 does not violate the Due Process Clauses of the Federal or State Constitutions.

QUESTION NO. VI: If the answer to the preceding question is that any of the provisions of Section 14 of the Act violate the Articles of Separation, would such provisions be constitutional upon consent to such provisions by the Legislature of Massachusetts?

ANSWER: Since the answer to Question No. V is that the Articles of Separation are not violated, this question is rendered inapplicable.

QUESTION NO. VII: Do the provisions of Section 15 of the Act violate the Articles of Separation, the Distribution of Power provisions or the Due Process Clauses of the Federal or State Constitutions?

ANSWER: We answer in the negative.

As the preliminary exposition has disclosed, the "reservations" by which the "public lots" come into being, and as conceived by Article X of the Maine Constitution, establish a limitation only that the State hold and preserve "public lots" for

the general class of public uses derived from the usage of Massachusetts. Thus, no private rights being involved, and the purposes for which the "public lots" are held and preserved being a collective grouping of public uses, the "public lots" themselves may likewise be treated collectively if thereby the general category of public uses may be furthered. Hence, sales, purchases and exchanges of "public lots", without retention of a "public lot" in each unincorporated township or tract and in order to assemble larger contiguous quantities of land, is permissible—provided that it is done to promote the beneficial public uses and purposes for which the "public lots" must be held and preserved.

Insofar as Section 15 confers power upon the Forest Commissioner to "relocate" any "public lots", including "both located and unlocated", we answer here as we answered Question No. 5. We cannot say that such authority to "relocate", taken on its face and per se, entails, necessarily, such interference with vested private rights of property as would amount to a retrospective governmental impairment in violation of the Due Process Clauses of the Federal or State Constitutions.

QUESTION NO. VIII: If the answer to the preceding question is that any of the provisions of Section 15 of the Act violate the Articles of Separation, would such provisions be constitutional upon consent to such provisions by the Legislature of Massachusetts?

ANSWER: Since the answer to Question No. VII is that the Articles of Separation are not violated, this question is rendered inapplicable.

QUESTION NO. IX: Do the provisions of Section 16 of the Act violate the Articles of Separation, the Distribution of Power provisions or the Due Process Clauses of the Federal or State Constitutions?

ANSWER: We answer in the negative.

The proposed use of the income from the "public lots" is consistent with (1) the concept that the "public lots" be held and preserved for an aggregate of public uses according to the usage of Massachusetts, as described in the answer to Question No. 3 and (2) the authority of the State of Maine to treat its "public lots" as a collective group for the furtherance of such generalized public uses, as explained in our answer to Question No. 7.

QUESTION NO. X: If the answer to the preceding question is that any of the provisions of Section 16 of the Act violate the Articles of Separation, would such provisions be constitutional upon consent to such provisions by the Legislature of Massachusetts?

ANSWER: Since the answer to Question No. IX is that the Articles of Separation are not violated, this question is rendered inapplicable.

Dated at Portland, Maine, this nineteenth day of June, 1973.

Respectfully submitted:

ARMAND A. DUFRESNE, Jr.
DONALD W. WEBBER
RANDOLPH A. WEATHERBEE
CHARLES A. POMEROY
SIDNEY W. WERNICK
JAMES P. ARCHIBALD