HARRISON FLYE, in Equity,

*vs.*

FIRST CONGREGATIONAL PARISH OF NEWCASTLE, et als.

Lincoln.   Opinion November 26, 1915.

Conveyance.         *Conveyance for pious purposes to person not in esse*
      Fraud.      *Injunction.   Ministerial Lot.   Ownership.*
               *Sale.   See 1 Maine Report, 271.*

In a bill in equity brought to prevent the consummation of the sale by the Parish of all the stumpage on a ministerial lot, or glebe, to restrain the cutting of lumber therefrom and to have the conveyance declared void, *Held:*

1. That the conveyance of this lot by Christopher Tappan in 1739 "unto the inhabitants now settled on Sheepscot river at a place called Newcastle............their heirs and assigns.............to be and remain in said settlement now called Newcastle for a glebe or parsonage forever," was a valid conveyance as a grant for pious uses, although no person or corporation was then in esse capable of taking.

2. That the town of Newcastle when subsequently incorporated in 1753 held the custody of the lot in its parochial capacity awaiting the settlement of a minister.

3. That upon the settlement of the first minister in 1754, he became seized of this lot in right of the town, in its parochial capacity, and held the same as a corporation sole to himself and his successors.

4. That after the organization of the First Congregational Parish in 1823, the ministers in succession held the title to this lot in right of the parish, and could convey the same with the assent of the parish.

5. That during the vacancies in the ministerial office, the fee was in abeyance, but the parish was entitled to the custody of the lot and to the rents and profits therefrom.

6. That since the last settled minister in 1874 the fee has been in abeyance awaiting a successor, and the parish has had the legal right to manage the lot and receive the income therefrom; but at no time has the title vested in the parish and at no time could it legally sell and convey the same.

7. That the corporation organized under the general law in 1913 as the First Congregational Parish is not a distinct and independent parish but merely a reorganization and rehabilitation of the old parish for the purpose of perpetuating its existence, and therefore as the successor of the old parish has the same rights in this lot as the old parish, but no more.

8. That this parish has no legal right to sell all the standing timber and thereby strip this lot, and the deed purporting to convey the same was invalid.

9. That the Methodist Church at Sheepscot, the would-be intervenor, has no rights or interest in this property.

On report. Bill sustained with single bill of costs.

Temporary injunction to be made perpetual.

Decree in accordance with this opinion.

This is a bill in equity to prevent the consummation of a sale of certain church or ministerial property, a lumber lot located at Sheepscot, in the town of Newcastle; to restrain the cutting of lumber therefrom by the grantee, and to have the sale declared void and for an adjudication as to the present ownership and rights in the property. The requisite answers and replications were filed.

At the conclusion of the evidence, questions of law of sufficient importance having arisen to justify the same, and by consent of the parties, this cause was reported to the Law Court to be determined upon such evidence as is legally admissible.

The case is stated in the opinion.

*Arthur S. Littlefield,* for plaintiff.

*Weston M. Hilton,* for defendant.

SITTING: SAVAGE, C. J., SPEAR, CORNISH, KING, BIRD, HANSON, JJ.

CORNISH, J.   This is a bill in equity brought to prevent the consummation of the sale of all the stumpage on a ministerial lot located at Sheepscot in the town of Newcastle, to restrain the cutting of lumber therefrom by the grantee, to have the conveyance dated September 1, 1914, declared void and to adjudicate the present ownership of the property.

The plaintiff is one of the three surviving members of the original Congregational parish in Newcastle, and he alleges that he brings the bill on behalf of himself, of other members of the parish,. and of the Congregational church at said Sheepscot.

J. D. McGraw, the minister of the Methodist church in Sheepscot asks the right to intervene, claiming that he is the person in whom the title to the property is now vested, in the right of the only parish existing at that place at the present time.

A recital of the historical facts connected with this ministerial lot is necessary to a clear understanding of the issue.

On May 15, 1739, Christopher Tappan of Newbury, Massachusetts, the then or prior owner of nearly all the land within the limits of the present town of Newcastle, granted "Unto the inhabitants now settled on Sheepscot river, at a place called New Castle in the County of York  .  .  .   their heirs and assigns forever for the uses hereinafter mentioned, two hundred acres of land, situate, lying and being in New Castle and is the lots No. fifteen and sixteen, also two thirty-sevenths of all the marsh and meadow lying within the bounds &c.  .  .  .   to have and to hold the said granted and gifted premises with all the appurtenances &c.  .  .  .   to the said inhabitants, their heirs and assigns to be disposed of in manner following, viz: one-half of said land and marsh to be disposed of to the first minister that shall be settled amongst said people at said place, either by ordination or instalment, to him, his heirs and assigns forever.   And the other moiety or half to be and remain in said settlement now called New Castle for a glebe or parsonage forever."

1.  MINISTER.  The town of New Castle was incorporated four-teen years later, in 1753, by the General Court of Massachusetts, and included the settlement at Sheepscot.  The town in its parochial capacity then assumed control of lots 15 and 16, and caused Rev. Alexander Boyd, a Presbyterian, to be ordained as the first settled minister on September 19, 1754.  His pastorate continued until December, 1758.  In that year a committee was appointed by the town to "lot" with Mr. Boyd and determine which of the lots con-veyed by Christopher Tappan should be his under the terms of the grant, he being the first settled minister, and he received lot 15. In this his title was absolute.  Lot 16 was therefore left as the glebe, or parsonage lot, and over that the present controversy has arisen.

The next minister was Thurston Whiting who on March 9, 1776, in town meeting, was given the choice to settle as a Presbyterian or Congregationalist.  He chose the latter, was ordained as a Con-gregational minister in July, 1776, and was dismissed in March, 1782.  From that time a succession of Congregational ministers was ordained or installed, the last being the Rev. John Haskell, who served from May 26, 1872, until October 1, 1874.  Since that time there has been no settled minister, but services have been held at various times, and with more frequency and regularity in the sum-mer season.

2.  CHURCH.  The Sheepscot Congregational church, the first church to be established in the town, was organized in 1776, the same year in which Mr. Whiting, the first Congregational minister, was settled, and was reorganized in 1799.  The last record in the church record book bears the date of 1875, the year following the last pastorate, that of Mr. Haskell.  The church reported to the State conference of 1892 for the year 1891, a membership of six. No reports were made after 1892.  Two members still survive, one of whom has taken letters of dismissal to another church.

3.  PARISH.  The First Congregational Society or Parish appears to have been organized in 1823.  Its records begin at that time. On October 4, 1797, when Rev. Kiah Bailey was ordained as the successor of Mr. Whiting, the town still constituted the parish, but it was not officially represented at the council which recommended the dissolution of the connection September 24, 1823, and the next minister, Jotham Sewall, Jr., who was ordained November 3, 1824, was called by a vote of the church, concurred in by the parish.

The parish at some time after its organization took charge of this ministerial lot No. 16, received the income therefrom and expended it either for the general purposes of the church or in the maintenance and repair of the church property. The parish records were kept only to 1877, but its members continued to exercise the same oversight and control and paid the taxes on the lot up to the year 1913.

4. CHURCH BUILDINGS. According to the History of Ancient Sheepscot and Newcastle by Rev. David Q. Cushman, made a part of the evidence by agreement, the Congregationalists had two meeting houses, one on the west side of the town (the Sheepscot side) and the other on the east side (the Damariscotta river side) and preaching was divided between the two places until 1844, when a new or second Congregationalist church was organized on the Damariscotta side. The Garrison Hill meeting house in Sheepscot was built by an association with records distinct from any church or society and known as the "Proprietors of Sheepscot Meeting House," and it was "voted that this house shall be dedicated a free house to all religious denominations." This was occupied as a union church, the Congregationalists being allowed one-half the time, the Methodists one-third and the Baptists one-sixth, until 1868, when the Congregationalists became the sole owners of the property. It is in this building that their services have since been held.

5. INCORPORATION OF PARISH. .The membership of the parish or society dwindled until in 1913 only three members survived, Harrison Flye, the plaintiff, Edwin Flye and William F. Chase. These three with thirty-three others, on June 26, 1913, in writing over their own signatures, signified their desire and purpose "to form a society to be known as the First Congregational Parish Society of Newcastle, the purpose of said society being the preservation and care of the property now vested in the First Congregational Society and the maintenance of public worship to such extent as may seem practicable." In furtherance of this desire and purpose, on August 7, 1913, an application was made to a Notary Public by the three surviving members of the Parish and five others, requesting him to issue his warrant in order that they might become incorporated as a religious society under the provisions of Chapter 57 of the Revised

Statutes.  The necessary legal steps were taken and the corporation was formed on September 6, 1913, under the name of the First Congregational Parish, its stated purposes being "to hold and care for all real and personal estate of said parish and the maintenance of public worship to such extent as may seem expedient."  The certificate of incorporation was approved September 22, 1913.  At this meeting the necessary officers were chosen, including trustees.

6.  SALE OF TIMBER.  After the incorporation of the parish its officers contracted for the sale of all the standing timber on the ministerial lot to Clair W. Freeman for the sum of five thousand five hundred dollars, and at a corporate meeting held on July 27, 1914, the parish voted to ratify and confirm the acts of its officers in this respect and the trustees were directed to execute and deliver the necessary conveyance.  On September 1, 1914, this vote was rescinded so far as it related to the execution of the deed and Edwin Flye was authorized to execute and deliver the same on behalf of the parish.  On that day the deed was executed and delivered and the balance of the purchase price of $5,500 was paid to the parish treasurer.  This bill in equity was brought nine days later.

The legal questions arising from the foregoing facts are rarely encountered at the present day, but were of not infrequent occurrence in the early history of New England, and certain well defined rules of law were then established governing the creation of parishes and the vesting and management of parish or ministerial lands. These are decisive of the issues here involved and a re-statement of these principles is therefore necessary.

At the time of the original grant from Christopher Tappan "unto the inhabitants now settled at Sheepscot river at a place called New Castle," neither town, nor church, nor parish was in existence. There was no person nor corporation then capable of taking.

But the conveyance was still effective.  It was held in *Proprietors of Shapleigh* v. *Pillsbury,* 1 Maine, 271, that such a grant is valid and if lands be so granted for pious uses to a person or corporation not in esse, the right to the possession and custody of the lands remains in the grantor until the person or corporation intended shall come into existence at which time the estate vests.  See also *Rice* v. *Osgood,* 9 Mass., 38; *Brown* v. *Porter,* 10 Mass., 93, and *Pawlet* v. *Clark,* 9 Cranch, 292.

When, therefore, the town was incorporated in 1753, all rights of the grantor, or of his heirs, ceased and the town took and held the lot in its parochial capacity awaiting the settlement of a minister. At that time towns exercised both municipal and parochial powers, all the inhabitants of the town being members of the parish, and they continued so to exercise both until a separate parish was formed, and then the parochial powers and duties of the town ceased.

Upon the settlement of the first minister, Rev. Alexander Boyd in 1754, he became seized of this lot in right of the town. Had the parish then existed independent of the town he would have held in right of the parish. When the parish was subsequently formed, it succeeded to the rights of the town theretofore acting in a parochial capacity, and the ministers from that time forward held the title in right of the parish. In this connection it is interesting to note that in 1839, precisely one hundred years after the original grant was made, Rev. Jotham Sewall, Jr., the then settled minister of this church and parish brought an action for an alleged trespass upon this lot 16, and his legal title to the lot and his right to maintain the action were upheld in these words: "We are not aware that any principle of local law will prevent the passing of this estate for a glebe or parsonage to the inhabitants of Newcastle, incorporated subsequently to the grant. We have heard no complaint for nearly a century from Christopher Tappan or his heirs, that the corporation of Newcastle has committed any disseizin or that they had failed to appropriate the land according to the intent of the donor. The town has taken and held it in their parochial character and as soon as the minister was ordained in 1776 he held it in the right of the parish. After his connection with the parish ceased they again proceeded to take charge of it till the settlement of Mr. Bailey who held it till 1824. The present plaintiff on his ordination became entitled to hold it." *Sewall* v. *Cargill,* 15 Maine, 414. See also *Cargill in error* v. *Sewall,* 19 Maine, 288.

The well settled rules governing the title and custody of parsonage lands are most succinctly stated in an early Massachusetts case, affecting property then situated in Massachusetts but now in Maine:

"When a minister of a town or parish is seized of any lands in right of the town or parish, which is the case of all parsonage lands, or lands granted for the use of the ministry, or of the minister

for the time being, the minister for this purpose is a sole corporation, and holds the same to himself and his successors. And, in case of a vacancy in the office, the town or parish is entitled to the custody of the same and for that purpose may enter and take the profits until there be a successor. Every town is considered to be a parish until a separate parish be formed within it, and then the inhabitants and territory not included in the separate parish form the first parish; and the minister of such first parish, by law, holds to him and his successors all the estate and rights which he held as minister of the town, before separation." *First Parish in Brunswick* v. *Dunning,* 7 Mass., 445. See also *Jewett* v. *Burroughs,* 15 Mass., 464, and *Richardson* v. *Brown,* 6 Maine, 464. The distinction between church and parish and the powers of each are elaborately elucidated by Chief Justice Shaw in *Stebbins* v. *Jennings,* 10 Pick., 171-182.

It only remains to make application of the foregoing principles. It is obvious that the several settled ministers of this church became in succession seized of this lot, in right of the town or parish; that during the vacancies in the ministerial office the fee of the lot was in abeyance, but the town in its parochial capacity until the organization of the parish, and ever after such organization the parish itself had custody and control of the lot and became entitled to the rents and profits therefrom until a successor was installed. Upon the installation of the successor the fee vested in him. Since 1874, when the last settled minister was dismissed, the fee has again been in abeyance while the management has been in the parish, but at no time did the fee itself vest in the parish and at no time could the parish convey. Nor could the minister for the time being aliene without assent of the parish. He holds in right of the parish and it is only when the parish assent that a valid conveyance can be made. *Weston* v. *Hunt,* 2 Mass., 500; *Porter* v. *Griswold,* 6 Maine, 430. Concurrence of both is necessary.

The corporation organized in 1913 as the First Congregational Parish was not a distinct and independent parish as the plaintiff contends, but merely a reorganization and rehabilitation of the few surviving members of the old parish for the purpose of perpetuating its existence by bringing in new members, injecting new blood, and adopting a corporate charter. The written declarations at the time,

the stated purposes of the charter, and the evidence of the parties leave no room for doubt on this point. *Parsonsfield* v. *Dalton,* 5 Maine, 217. Therefore this corporation as the successor of the old parish has the legal right to the management of this glebe and to the income arising therefrom until the settlement of another minister of this church. But that is the extent of is powers. It has no further rights. It cannot convey the property. *Bucksport* v. *Spofford,* 12 Maine, 487. The title does not vest in it and therefore it has no title to convey. It cannot commit waste. The deed in this case is invalid. It is true that the deed does not convey the soil, but it does convey "all the trees standing and growing on the lot." If carried into effect the lot would be stripped, and not merely the income or profits of the capital to which the parish is entitled, but the capital itself would be effectually disposed of. This exceeded the powers of the parish for the reasons already stated. The injunction must therefore be made permanent, a reconveyance must be made by the purchaser, Clair W. Freeman, and the consideration received by the parish must be repaid to said Freeman. The details can be embodied in the decree to be filed below.

The conclusion reached renders unnecessary the consideration of other questions raised in argument, namely the rights of the Methodist church in this lot and the alleged fraud upon the parish by its agent in the sale of the timber. Regarding the first point it is sufficient to say that the Methodist church has no interest or rights whatever in the property; and regarding the second point we find no fraud practiced upon the parish by its agent who was duly authorized to negotiate the sale. Moreover the parish itself, of which this plaintiff is a member, after full knowledge of the facts ratified and confirmed the acts of its agent and consummated the sale by directing a conveyance to be made.

However, upon the main question of the invalidity of the conveyance itself for want of title in the parish the plaintiff should prevail.

> *Bill sustained with single bill of costs.*
> *Temporary injunction to be made perpetual.*
> *Decree in accordance with this opinion.*